**OSRECOVERY, INC., et al., Plaintiffs,**

v.

**ONE GROUPE INTERNATIONAL, INC., et al., Defendants.**

No. 02 Civ.8993(LAK).

United States District Court, S.D. New York.

Jan. 21, 2005.

**360**

Wayne C. Matus, A. John P. Mancini, Mayer, Brown, Rowe & Maw LLP, New York City, for Plaintiffs.

Lawrence W. Newman, James M. Torre, Baker & McKenzie, New York City, for Defendant Latvian Economic Commercial Bank.

### MEMORANDUM OPINION

KAPLAN, District Judge.

This is a civil action based on an alleged scheme involving the sale of an allegedly non-existent gold-backed Internet currency and the operation of a massive Ponzi scheme. Latvian Economic Commercial Bank ("Lateko") and Parex Bank ("Parex"), which is also Latvian, allegedly participated in the scheme. The third amended complaint (the "Complaint") asserts claims against the banks under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),[1] as well as various state law claims. The matter is before the Court on Lateko's motion to dismiss.

## I. Background

### A. *The Complaint*

The Complaint alleges the following facts, which the Court accepts as true for the purposes of this motion.

#### 1. *The OSGold / OSOpps Scheme*

At the center of this action is a scheme spearheaded by defendants David C. Reed, Randy L. Johnson, and a number of entities they controlled, including One Groupe International, Inc. ("One Groupe") and its subsidiaries, OSGold.com and OSOpps. com.[2] The plaintiffs are individual account holders and investors, as well as OSRecovery, which is the purported assignee of thousands of individual claims.[3]

The scheme involved two parts. First, in or around March 2001, the One Groupe

---

1. 18 U.S.C. §§ 1962(a)-(d).

2. Reed, Johnson, One Groupe, OSGold.com and OSOpps.com are referred to collectively as the "One Groupe Defendants."

3. OSRecovery is a New York corporation, and John Doe Plaintiffs 1 through 20 are residents of the State of New York. Cpt. ¶ 12–13. The remaining individual plaintiffs are residents of "numerous jurisdictions from around the world, including the United States." *Id.* ¶ 14.

Defendants began selling an Internet currency, denominated as "OSGold," which they advertised as being (1) 100 percent backed by gold bullion, (2) usable to purchase goods and services on the Internet, and (3) accessible with a debit card.[4] Second, in May or June 2001, the One Groupe Defendants launched "OSOpps," which was a "high-yield" investment program that promised monthly returns of 30 percent on three-month investments and 45 percent on 12-month investments and guaranteed investors the return of their principal, in full, when the investments matured.[5] Investments in OSOpps had to be made almost exclusively in OSGold, thereby luring consumers to deposit money into the OSGold system.[6]

The One Groupe scheme initially was successful. OSGold.com opened between 60,000 and 100,000 accounts, and plaintiffs estimate that over $250 million was deposited.[7] Among the first account holders were members of Cash Over Time, another high-yield investment program.[8] In or around February 2001, apparently before Cash Over Time was about to crash, it announced to its members that future pay outs would be made in OSGold and that OSGold accounts automatically would be opened for them.[9]

Eventually, however, the One Groupe scheme began to fall apart. Sometime between May and July 2002, on the eve of the maturity date for the 12-month OSOpps investment programs, the One Groupe Defendants suddenly suspended operations of OSGold.com and OSOpps.com.[10] Account holders and investors were prevented from redeeming or otherwise using OSGold, and their debit cards ceased functioning.[11] As it turns out, OSGold never was backed by gold bullion, and the proceeds were misappropriated for personal use.[12] OSOpps actually was a Ponzi scheme that paid out returns on initial investments but ultimately collapsed under its own weight.[13]

The scheme, however, did not come to an end when OSGold and OSOpps ceased operating. As the scheme began to unravel, the One Groupe Defendants tried to stall consumers from suing or going to authorities. On July 15, 2002, One Groupe posted a message on its website reassuring account holders and investors that it was working with International Negotiations Team ("INT"), a purportedly independent negotiating team, to handle claims.[14] Later, in October 2002, One Groupe posted a message from Reed reassuring account holders and investors that it was continuing to work with INT to resolve the issues and return deposits.[15] Meanwhile, INT issued statements on its website that discouraged consumers from going to authorities or suing.[16]

---

4. *Id.* ¶¶ 40, 42, 53.

5. *Id.* ¶¶ 41, 66.

6. *Id.* ¶ 41.

7. *Id.* ¶ 38.

8. *Id.* ¶ 52.

9. *Id.*

10. *Id.* ¶¶ 3, 38, 70, 211.

11. *Id.*

12. *Id.* ¶¶ 4, 64.

13. *Id.* ¶¶ 66–67, 70.

14. *Id.* ¶ 213. Apparently, INT initially told potential claimants it would charge an upfront fee for its recovery efforts, but later said it would instead deduct fees for its services from any monies it recovered. *Id.* ¶¶ 220, 223.

15. *Id.* ¶ 217.

16. *Id.* ¶¶ 215–16.

In fact, it appears that INT was collaborating with Reed to thwart the involvement of law enforcement and the courts.[17]

## 2. Lateko's Role in the Scheme

Lateko's role in the scheme centers around the services it provided to the One Groupe Defendants.

Its involvement began in December 2001 when it entered into an agreement with Card Accounts, a joint venture run by Reed, Johnson, and other defendants, to provide anonymous debit cards to OSGold and OSOpps account holders.[18] The debit cards were part of a master account system set up at Lateko.[19] Each master account was held by Reed and several of the defendant Exchange Makers.[20] Within each master account were numerous sub-accounts, each of which was linked to a debit card.[21] The master account holders purchased a series of debit cards corresponding to their sub-accounts and in turn sold those cards to OSGold and OSOpps account holders.[22] To fund a sub-account, the cardholder converted OSGold to hard currency through an Exchange Maker.[23]

The Exchange Maker in turn deposited the funds into a master account and allocated it to a sub-account.[24] Cardholders then could withdraw hard currency from any ATM machine in the world that participated in the CIRRUS system.[25] On the top right corner of the cards appeared the name "LATEKO BANKA," and on the back appeared the CIRRUS symbol.[26]

## 3. Communications Between Lateko and Card Accounts

Lateko engaged in various communications with Card Accounts. The Complaint identifies at least twelve emails between the two companies from February 5, 2002 through July 18, 2002.[27] All but one were from Gene Ginter, a manager in the card accounts department at Lateko,[28] to one or more individuals at Card Accounts. The emails generally related to the services Lateko provided Card Accounts, such as the shipment of debit cards,[29] transfer of money,[30] and software installation.[31] In addition, three emails contained a message from Ginter demanding that Card Accounts not use his or Lateko's name on its website or otherwise.[32]

---

17. *Id.* ¶¶ 213, 215–24.

18. *Id.* ¶ 172. The Complaint does not identify Card Accounts' state of incorporation or principal place of business.

19. *Id.* ¶ 173.

20. *Id.* Exchange Makers are companies that convert hard currency to e-currency, and *vice versa*, for a fee. *Id.* ¶ 71. The Complaint alleges that a number of Exchange Makers participated in the scheme. *See, e.g., id.* ¶¶ 71–130.

21. *Id.* ¶ 173.

22. *Id.*

23. *Id.* ¶¶ 173.

24. *Id.* ¶¶ 174.

25. *Id.* ¶ 176.

26. Mancini Decl. Ex. 4. In addition, Lateko designed a software system that made it possible to send reports to cardholders. *See, e.g.,* Cpt. ¶¶ 178–79.

27. *Id.* ¶¶ 178–79, 181–83, 185–87, 189, 200, 204, 209.

28. *Id.* ¶ 166.

29. *Id.* ¶¶ 182, 185–86, 200.

30. *Id.* ¶ 183.

31. *Id.* ¶¶ 178–79.

32. *See id.* ¶ 187 (email dated April 18, 2002 from Ginter to Card Accounts employee saying, "[P]lease be more carefull [*sic*] and try not to mention LATEKO and especially my tel. and other addresses."); ¶ 189 (email dated June 18, 2002 from Ginter to Card Accounts employee saying, "I was told today that we will stop supplying cards to you in

#### 4. *Lateko Denies Any Relationship With Card Accounts and the One Groupe Defendants*

Despite its interactions with Card Accounts, Lateko later denied having any relationship with Card Accounts. In a letter dated July 25, 2002, MasterCard Europe, which had a contract with Lateko, sent a letter to Lateko inquiring about, among other things, Lateko's role in an apparent scheme involving "www.cardaccounts.tv," as well as its relationship, if any, with One Groupe and OSGold.[33] In a reply dated September 13, 2002, Lateko's president stated that Card Accounts had approached Lateko about entering into a business relationship, but that, upon investigation, Lateko had discovered Card Accounts' involvement with prior frauds and therefore immediately refused any cooperation.[34] The letter stated, in relevant part:

> "The owners of the web page http://www.cardaccounts.tv offered us to establish business relationship with the Bank. However, upon result of a special research made by the Bank's Security Department, we have been informed that these persons have been previously involved in a number of financial frauds. Any cooperation with them was immediately refused."[35]

Lateko's president denied also any cooperation between Lateko and One Groupe or OSGold.[36]

#### 5. *Lateko's Predicate Acts*

The Complaint alleges predicate acts of mail and wire fraud[37] and money laundering.[38] In particular, it refers to (1) shipments of debit cards from Lateko to Card Accounts in February 2002, including a shipment to defendant Reed,[39] (2) most of the Ginter emails,[40] and (3) transfers of money between Lateko and other banks between February 11, 2002 and May 9, 2002.[41] For each communication, the Complaint identifies the date, sender, recipient, and purpose.[42]

### B. *Procedural History*

Plaintiff OSRecovery brought this action on November 12, 2002. It has been the subject of several opinions and orders by the Court.[43]

---

case the image of our card will not be taken off within 24 hours. It is still shown on your site."); ¶ 209 (email dated April 16, 2002 from Ginter to Card Accounts employee saying, "Somebody(:)) has been placed my tel. number on the site cardaccounts.tv. I am not happy about that, as several people has been calling me and asking to solve their problems. Would David & Co. give another number, better not the LATEKO's one, as it is dangerous. Any unsatisfied person can call to police and we will close the accounts of all yuor [*sic*] companies within one day. Please tell to the people that the LATEKO sould [*sic*] not appear on any sites.".

**33.** *Id.* Ex. 8.

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

**37.** 18 U.S.C. §§ 1341, 1343.

**38.** *Id.* § 1956.

**39.** Cpt.App. A.

**40.** *Id.* App. B.

**41.** *Id.* App. C.

**42.** *Id.* Apps. A and B.

**43.** *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F.Supp.2d 340 (S.D.N.Y.2004) (granting in part motion for a preliminary injunction and an order of attachment against certain defendants); *OSRecovery, Inc. v. One Groupe Int'l Inc.*, 2004 WL 238035 (S.D.N.Y. Feb. 9, 2004) (granting Lateko's motion to dismiss the second amended complaint with leave to file a third amended complaint); *OSRecovery, Inc. v. Onegroupe Int'l Inc.*, 2003 WL 22285292 (S.D.N.Y. Oct. 6, 2003) (order concerning discovery dispute with Lateko), *reconsideration granted in part by* 2003 WL 22326964 (S.D.N.Y. Oct. 10, 2003); *OSRecovery, Inc. v. One Groupe Int'l Inc.*, 262 F.Supp.2d 302 (S.D.N.Y.2003) (compelling

The Court granted Lateko's motion to dismiss the second amended complaint on the ground that it failed adequately to allege *scienter*, but granted leave to amend and ordered that discovery continue.[44] Plaintiffs filed the Complaint on April 14, 2004. It asserts five counts against Lateko. Count 2 alleges violations of RICO, 18 U.S.C. §§ 1962(a)-(d). Counts 3 through 6 allege common law fraud, aiding and abetting common law fraud, negligent misrepresentation, and breach of fiduciary duty, respectively. Finally, count 12 seeks the imposition of a constructive trust.

Lateko moves to dismiss the RICO claims on the grounds that (1) the Court lacks subject matter jurisdiction, (2) the claims are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"),[45] (3) the alleged RICO violations did not cause plaintiffs' injuries, (4) the Complaint fails to allege a pattern of racketeering activity, and (5) the Complaint does not adequately plead the other elements of a RICO violation. It seeks to dismiss all of the state law claims under Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity and under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Finally, it moves to dismiss all claims under Federal Rule of Civil Procedure 10(a) on the ground that the Complaint fails adequately to identify the plaintiffs in this action.

## II.  Standards Governing Motions to Dismiss

In resolving a Rule 12(b)(6) motion, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the plaintiff's favor.[46] "[D]ismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief." [47] The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims.[48]

When the relevant facts are not in dispute, a court resolving a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "must take as true all of the material factual allegations contained in the complaint." [49] Nevertheless, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." [50] The party seeking to invoke the subject matter jurisdiction of

witness to answer deposition questions), *reconsideration denied by* 2003 WL 21285539 (S.D.N.Y. June 4, 2003); *Osrecovery, Inc. v. One Groupe Int'l, Inc.,* 2003 WL 23313 (S.D.N.Y. Jan. 3, 2003) (granting in part motion to file a second amended complaint; denying defendant Johnson's motion to dismiss the first amended complaint); *Osrecovery, Inc. v. One Groupe Int'l, Inc.,* 2002 WL 31777628 (S.D.N.Y. Dec. 12, 2002) (ordering plaintiff to show cause why action should not be dismissed for lack of subject matter jurisdiction).

44.  *OSRecovery,* 2004 WL 238035.

45.  Pub.L. No. 104–67, 109 Stat. 737 (1995).

46.  *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002) (citing *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994)).

47.  *Id.* (citing *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998); *accord Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000)).

48.  *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

49.  *LeBlanc v. Cleveland,* 198 F.3d 353, 356 (2d Cir.1999) (citing *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998)).

50.  *Shipping Fin. Servs.,* 140 F.3d at 131 (citing *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)).

the court bears the burden of demonstrating that such jurisdiction exists.[51]

Rule 9(b) requires that fraud be pled with particularity.[52] The complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."[53] Although "malice, intent, knowledge and other condition of mind of a person may be averred generally,"[54] plaintiffs nevertheless are required to "allege facts that give rise to a strong inference of fraudulent intent."[55] The requisite intent may be pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[56]

### III.  The RICO Claim

The RICO statute makes it unlawful for any person to (a) use or invest income from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise, (b) acquire or maintain an interest in an enterprise through a pattern of racketeering activity, (c) conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, or (d) conspire to do any of the above.[57] Section 1964(c) creates a private civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962."[58] To demonstrate standing under the RICO statute, a plaintiff must plead and ultimately prove "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962."[59]

The Complaint alleges that Lateko violated Sections 1962(a)-(d). Defendant challenges these claims on the grounds that (1) the Court lacks subject matter jurisdiction, (2) the claims are barred by the PSLRA, (3) the alleged RICO violations did not cause plaintiffs' injuries, (4) the Complaint fails to allege a pattern of racketeering activity, and (5) the Complaint fails adequately to allege various other elements of the RICO statute.

### A.  Subject Matter Jurisdiction

Although "[t]he RICO statute is silent as to any extraterritorial application," it is well-settled that foreign entities are not immune from RICO liability on the basis of their citizenship.[60] But "[l]ess clear is the character and amount of activity in the United States that will justify RICO sub-

---

**51.** *Scelsa v. City Univ. of New York*, 76 F.3d 37, 40 (2d Cir.1996).

**52.** *See* FED. R. CIV. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity.").

**53.** *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 186 (2d Cir. 2004) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996)).

**54.** FED. R. CIV. P. 9(b).

**55.** *Eternity Global Master Fund*, 375 F.3d at 187 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).

**56.** *Id.* (quoting *Acito*, 47 F.3d at 52).

**57.** 18 U.S.C. §§ 1962(a)-(d).

**58.** *Id.* § 1964(c).

**59.** *De Falco v. Bernas*, 244 F.3d 286, 305 (2d Cir.), *cert. denied*, 534 U.S. 891, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001) (quoting *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir.1996)); *accord Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir.), *cert. denied*, 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003).

**60.** *North South Fin. Corp. v. Al–Turki*, 100 F.3d 1046, 1051–52 (2d Cir.1996).

ject matter jurisdiction over a foreign entity." [61]

In *North South Finance*, the Second Circuit declined to articulate a test for extraterritorial application of RICO.[62] It noted that guidance can be found in "precedents concerning ... international securities transactions and antitrust matters," but at the same time it cautioned that "the tests developed in securities and antitrust cases are premised upon congressional intent in enacting the Securities Exchange Act [of 1934] and the antitrust statutes, not the intention of Congress concerning RICO." [63] Accordingly, it cannot be "assume[d] that congressional intent in enacting RICO justifies a similar approach to the statute's foreign application." [64] The ultimate inquiry is whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries." [65]

In securities cases, two alternative tests are used to determine the extraterritorial reach of securities laws: the conduct test and the effects test.[66] Under the conduct test, jurisdiction exists only "where conduct material to the completion of the fraud occurred in the United States" and that conduct "directly caused" the loss.[67] The effects test, by comparison, confers jurisdiction "whenever a predominantly foreign transaction has substantial effects within the United States." [68] The conduct test implements Congress' intent that the United States not be used as a base for exporting fraudulent securities, even when sold only to foreigners, whereas the effects test reflects Congress' intent that the securities laws protect domestic investors and domestic markets from foreign securities frauds.[69]

In antitrust cases, before Congress spoke on the issue, courts adopted a slightly different version of an effects test. Under that test, the Sherman Act reached conduct abroad only if the conduct "was meant to produce and did in fact produce some substantial effect in the United States." [70]

61. *Id.* at 1052.

62. *Id.*

63. *Id.*

64. *Id.* Although it did not specify the appropriate test for RICO cases, the Second Circuit noted, in *dictum,* that the antitrust test may be "equally or even more appropriate" than the securities tests because "the civil action provision of RICO was patterned after the Clayton Act" and "RICO (like the antitrust laws) provides for treble damages, which heightens concerns about international comity and foreign enforcement." *Id.*

65. *Id.* (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975)).

66. *E.g., id.* (citing *Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 121–22 (2d Cir.1995), *cert. denied,* 516 U.S. 1044, 116 S.Ct. 702 (1996)).

67. *E.g., id.* at 1052 (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir. 1983)); *Nuevo Mundo Holdings v. PriceWaterhouse Coopers LLP*, 2004 WL 2848524, at *2 (S.D.N.Y. Dec. 9, 2004); *Roquette Am., Inc. v. Amylum N.V*, 2004 WL 1488384, at *7 (S.D.N.Y. July 1, 2004).

68. *E.g., North South Fin.*, 100 F.3d at 1052 (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir. 1989)); *Nuevo Mundo Holdings*, 2004 WL 2848524, at *3; *Roquette Am.*, 2004 WL 1488384, at *7.

69. *E.g., North South Fin.*, 100 F.3d at 1052.

70. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Congress in 1982 enacted the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, which clarified the Sherman Act's reach over foreign commerce. The FTAIA removes from the Sherman Act's reach all non-import activity involving foreign

Given that the effects tests focus on the location of the alleged injury, this Court will consider separately the claims raised by plaintiffs who were injured outside the United States and those who were injured inside.

### 1. *Foreign Plaintiffs*

■ The allegations underlying the RICO claim do not establish subject matter jurisdiction over the foreign plaintiffs.

Lateko's alleged conduct seems to have occurred primarily outside the United States. The only meetings between Reed and Lateko identified in the Complaint took place in Latvia.[71] In addition, most of Lateko's alleged communications with Card Accounts appear to have involved persons, on both ends, who were working out of countries other than the United States.[72] The only allegation of conduct by Lateko in the United States is that it made two shipments of debit cards to the United States.[73] But the Complaint does not allege that these particular acts were either material to the fraud or directly caused the losses of the foreign plaintiffs. The Complaint therefore does not satisfy the conduct test.

■ Nor do the allegations satisfy either of the effects tests. As discussed in the next section, Lateko's conduct allegedly caused effects in the United States by injuring domestic OSGold account holders. Such domestic injuries, however, were independent of the injuries allegedly suffered by foreign plaintiffs.[74]

Finally, it is unlikely that Congress intended for federal courts to devote precious resources to claims based on foreign injuries resulting from a foreign company's foreign conduct. To hold otherwise would be to extend RICO liability over the world.

### 2. *Domestic Plaintiffs*

■ The allegations concerning the domestic plaintiffs do satisfy the effects tests. Lateko allegedly injured domestic plaintiffs who were in possession of its debit cards by creating a tiered account

---

commerce unless the conduct (1) has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, and (2) such effect gives rise to a Sherman Act claim. *See* 15 U.S.C. §§ 6a(1), (2). Under the FTAIA, the Sherman Act does not reach plaintiffs injured outside the United States where the alleged anticompetitive conduct is in significant part foreign and the foreign injury is independent of any domestic injury. *F. Hoffman–La Roche Ltd. v. Empagran S. A.*, 542 U.S. 155, 124 S.Ct. 2359, 2366, 159 L.Ed.2d 226 (2004).

**71.** Cpt. ¶¶ 180, 182.

**72.** For example, the Complaint does not identify the destination country of Ginter's emails, but most appear to have been sent to countries other than the United States. Ten of the eleven Ginter emails alleged in the Complaint were sent to defendant Frank Zuchristian and/or Koenraad Debedts, both of whom worked at Card Accounts. *Id.* ¶¶ 179, 182–83, 185–87, 189, 200, 204, 209; *cf. id.* ¶ 166

(Ginter "regularly corresponded by e-mail" with Zuchristian and Debedts, but corresponded with Johnson, who resided in the United States, only "on occasion"). Although the Complaint does not allege the country in which Zuchristian and Debedts worked, it alleges that Zuchristian "at all relevant times" resided in The Netherlands or Latvia, and that Debedts was his business partner. *Id.* ¶¶ 25, 166.

**73.** *Id.* ¶¶ 185, 186.

**74.** *Cf. Bersch*, 519 F.2d at 985 n. 24, 987, 993 ("[T]he federal securities laws ... do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses."); *Empagran*, 542 U.S. at ———–———, 124 S.Ct. at 2366–71 (the Sherman Act does not reach the claims of foreign purchasers who were injured by anticompetitive conduct that was in significant part foreign, caused some domestic injury, and independently caused separate foreign injury).

system that gave certain defendants unlimited access to plaintiffs' funds. Moreover, it allegedly knew of Card Accounts' involvement in previous frauds when that company first approached it about a relationship, an allegation that suggests—at least at this stage of the litigation—that Lateko was aware of wrongdoing.[75] These allegations show conduct by Lateko which was meant to and did produce some substantial effect in the United States. The Court therefore has subject matter jurisdiction over the RICO claims brought by domestic plaintiffs.[76]

## B. The Private Securities Litigation Reform Act

■ Defendant contends that plaintiffs' RICO claims are barred by the PSLRA because they are based on conduct that is actionable as securities fraud. It points out that the Complaint alleges securities fraud against other defendants, including the One Groupe Defendants.

Section 1961(1) defines "racketeering activity" by enumerating the particular acts and offenses that constitute predicate acts.[77] Prior to the enactment of the PSLRA, fraud in the sale of securities was racketeering activity.[78] Section 107 of the PSLRA, however, amended Section 1964(c) of RICO to provide that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."[79] Congress intended that the amendment eliminate as a predicate offense under RICO not only securities fraud, but "other specified offenses, such as mail or wire fraud, ... if such offenses are based on conduct that would have been actionable as securities fraud."[80] Accord-

**75.** *See supra* Part IVB1.

**76.** This raises the issue of whether the Court has supplemental jurisdiction over the state law claims of the foreign plaintiffs. *See* 28 U.S.C. § 1367(a) (supplemental jurisdiction exists over claims that are "so related to" claims over which the court has original jurisdiction that "they form part of the same case or controversy under Article III of the United States Constitution"). But the Court need not decide whether the claims of the foreign plaintiffs form part of the same case or controversy as the claims of the domestic plaintiffs. Even if that were the case, the Court would decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). If residence is any indication, twenty plaintiffs were injured in New York and the remaining plaintiffs, numbering over a thousand, were injured either in other parts of the U.S. or in "numerous ... foreign jurisdictions." Cpt. ¶ 8. If the Court were to entertain the claims of the plaintiffs injured in numerous foreign jurisdictions, it would have to resolve difficult issues of choice of law, and if New York choice of law looks to the laws of the countries where the alleged conduct or injury occurred, the Court would have to apply the laws of those numerous jurisdictions. Such an exercise not only would be daunting, it would disservice the interests of other coun-

tries in protecting their own citizens. Nor does the Court see any conceivable interest the U.S. might have in handling fraud claims based on foreign injuries caused by a foreign defendant engaged in foreign conduct. As the exercise of supplemental jurisdiction would be improper, all of the claims of the foreign plaintiffs are dismissed.

**77.** *See* 18 U.S.C. § 1961(1).

**78.** *See id.* § 1961(1)(D) ("racketeering activity" includes "any offense involving ... fraud in the sale of securities").

**79.** *Id.* § 1964(c).

**80.** Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746; *see also Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F.Supp.2d 243, 248 (S.D.N.Y.2002) ("In amending RICO, Congress was clear in stating that the PSLRA 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.' ") (quoting *Mezzonen, S.A. v. Wright*, No. 97 Civ. 9380(LMM), 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999)).

ingly, plaintiffs cannot avoid the PSLRA through artful pleading.[81]

A preliminary issue is whether the scheme involved "securities," as that term is defined by the Securities Act of 1933 (the "Securities Act")[82] and the Securities and Exchange Act of 1934 (the "Exchange Act").[83] The Court assumes without deciding that it did.[84] Of course the inquiry does not end here. Although a scheme may have involved securities fraud, the conduct of each participant in the fraud is not necessarily actionable under the securities laws.[85] The relevant question, thus, is whether Lateko's alleged conduct is actionable under those laws.

In *Central Bank, N.A. v. First Interstate Bank, N.A.*,[86] the Supreme Court held that there is no private right of action for aiding and abetting under Section 10(b) of the Exchange Act.[87] "[T]he statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who

commits a manipulative or deceptive act."[88] Secondary actors may be held liable as primary violators, but "only if *all* of the requirements for primarily liability under Rule 10b–5 are met."[89]

In this Circuit, a "bright-line" test is used to determine whether a defendant is liable for misstatements and omissions under Section 10(b).[90] A "defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)."[91] The Second Circuit has rejected the so-called "substantial participation" test, which holds that a party may be liable for "substantial participation" in misstatements or omissions made by others.[92] Conduct that falls short of the bright line test is "merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."[93]

Underlying plaintiffs' RICO claims are allegations of Lateko's facilitation of the fraud by providing banking services, including the creation of a master account

---

81. *See, e.g., Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 329–30 (3d Cir.1999) (allowing plaintiffs to engage in "surgical presentation of the cause of action" would undermine the purpose of the RICO amendment).

82. 15 U.S.C. § 77b(a)(1).

83. *Id.* § 78c(a)(10).

84. The parties did not brief the issue of whether OSGold accounts and OSOpps investments were securities. The Court need not decide the issue because the ultimate question—whether the conduct underlying plaintiffs' RICO claims is actionable as securities fraud—is resolved on other grounds.

85. *Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 1999 WL 47239, at *6 (S.D.N.Y. Feb. 3, 1999) (conduct that amounts to aiding and abetting is not actionable under the securities laws and therefore is not barred by the PSLRA as a basis for asserting a RICO claim).

86. 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

87. *Id.* at 176, 114 S.Ct. 1439.

88. *Id.* at 177–78, 114 S.Ct. 1439 (internal citations omitted).

89. *Id.* at 191, 114 S.Ct. 1439 (emphasis in original).

90. *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175–76 (2d Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999).

91. *Id.* at 175 (quoting *Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997)).

92. *Id.* at 176 (citing *Shapiro,* 123 F.3d at 720).

93. *Id.* at 175 (quoting *Shapiro,* 123 F.3d at 720).

system and the issuance of debit cards.[94] As this conduct did not involve misstatements or omissions by Lateko in connection with the purchase or sale of securities, it was no more than aiding and abetting. Hence, it is not actionable under the securities laws and therefore actionable under RICO, assuming the claims are otherwise sufficient.

Defendant contends that the RICO claims nevertheless are insufficient because the Complaint alleges that Lateko "attracted depositors to OSGold and investors to OSOpps" and "was one of the principal reasons that many, if not all, of the plaintiffs invested their money in OSGold."[95] It is not apparent to the Court, however, how these allegations transform conduct that constitutes aiding and abetting into a primary violation of the securities laws.

Nor do the Complaint's allegations that Lateko made certain "misrepresentations" and "omissions" suffice to defeat the RICO claims. The substance of those allegations is only that Lateko implicitly misrepresented the legitimacy and viability of the One Groupe enterprise by associating itself and the well-recognized CIRRUS symbol with the One Groupe Defendants, thus lending them an air of legitimacy.[96] But this falls far short of an actionable misstatement under the securities laws for the simple reason that it involved no actual statements by Lateko. As Lateko points out, there is no indication that it had any communications with the plaintiffs, let alone that it made any statements about the legitimacy or viability of One Groupe. As for allegations that Lateko placed the CIRRUS symbol on the debit cards, there is no suggestion that the problem with the cards was their incompatibility with the CIRRUS network—in other words, that this constituted a misrepresentation. Accordingly, none of Lateko's so-called misrepresentations is actionable as securities fraud.

The claimed omissions are equally insufficient. Plaintiffs allege that Lateko failed to disclose, among other things, that the master account system gave certain defendants unlimited access to sub-accounts.[97] But a party cannot be liable under Section 10(b) for failing to disclose material information unless it had a duty to do so.[98] "[T]he duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"[99]

---

**94.** *See, e.g.,* Cpt. ¶ 196 ("LATEKO Bank's gross recklessness assisted with and facilitated the OSGold and OSOpps fraud by providing a means through which the Defendants could withdraw cash from the system that did not belong to them."); *see also, e.g., id.* ¶ 169 ("[T]he tiered account system . . . gave the Defendants unauthorized control of Plaintiffs' money, which, in turn, allowed Defendants to filter the funds fraudulently obtained from Plaintiffs out of the accounts held by certain Defendants at Defendant LATEKO Bank, undetected.").

**95.** Lateko Mem. 12 (quoting Cpt. ¶¶ 42, 169); Lateko Reply Mem. 3 (same).

**96.** *See, e.g.,* Cpt. ¶ 170 ("Defendant LATEKO Bank's association of its multi-national debit card network and its reputation as one of Latvia's most successful banks with the One Groupe Entities aided and abetted the One Groupe fraud by propping up the viability and legitimacy of the One Groupe Entities, including OSGold and OSOpps."); *id.* ¶ 169 ("The partnership between Defendant LATEKO Bank and the One Groupe Entities attracted depositors to OSGold and investors to OSOpps by lending it legitimacy through the well-recognized and reputable CIRRUS symbol employed by MasterCard International, Inc.").

**97.** *See id.* ¶¶ 141, 284.

**98.** *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

**99.** *Id.* (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

Here, plaintiffs have failed to articulate a "fiduciary or other similar relation of trust and confidence" between themselves and Lateko.[100] A party does not owe a duty to disclose under the securities law if it has had no prior dealings with the plaintiff.[101] There is no indication in the Complaint or elsewhere that the plaintiffs were customers of, or had any other type of relationship with, Lateko. According to the Complaint, the accounts at issue were held by Reed and the defendant Exchange Makers, and Lateko issued debit cards to these account holders, not to the plaintiffs. It does not appear that Lateko had any interactions with the plaintiffs other than through the withdrawals plaintiffs made at ATM machines. As there is no indication of any relationship between Lateko and the plaintiffs, there is no basis for concluding that Lateko owed plaintiffs a duty to disclose. The alleged omissions therefore are not actionable under the securities laws.[102]

As plaintiffs' claims against Lateko are not actionable under the federal securities law, they are not barred by the PSLRA.

## C. Causation

As previously mentioned, a civil RICO plaintiff must plead that his injuries were caused "by reason of" the defendant's RICO violation.[103] This requirement has been interpreted to mean that a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation.*"[104] Section 1962(c), for example, prohibits conducting or participating in the affairs of an enterprise through a pattern of racketeering activity.[105] Accordingly, a plaintiff asserting a Section 1962(c) claim satisfies the causation element in Section 1964(c) by showing an injury caused by the predicate racketeering acts themselves.[106]

The same is not true for Section 1962(a).[107] Section 1962(a) makes it unlawful to invest income received from racketeering activities to acquire an interest in, establish, or operate an enterprise.[108] Thus, unlike Section 1962(c), "the essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income."[109] Accordingly, to state a claim under 1962(a), a plaintiff must allege an injury resulting from the defendant's investment of racketeering income in an enterprise (i.e., an "investment injury"), separate and apart from any injury caused by the predicate acts themselves.[110]

Nor does an injury resulting from predicate acts meet the causation requirement

---

**100.** *See* Lateko Mem. 23–26.

**101.** *Chiarella,* 445 U.S. at 232, 100 S.Ct. 1108.

**102.** Even outside the securities context, banks generally do not owe a duty, fiduciary or otherwise, to noncustomers with whom they have not direct relationship. *See, e.g., Eisenberg v. Wachovia Bank, N.A.,* 301 F.3d 220, 224–27 (4th Cir.2002) (interpreting North Carolina law and collecting cases from other jurisdictions); *Renner,* 1999 WL 47239, at *13 (interpreting New York law and collecting cases from other jurisdictions); *Volpe v. Fleet Nat'l Bank,* 710 A.2d 661, 663–64 (R.I.1998) (interpreting Rhode Island law and collecting cases from other jurisdictions).

**103.** *See* 18 U.S.C. § 1964(c); *Lerner,* 318 F.3d at 120.

**104.** *Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)) (emphasis in *Ouaknine* ).

**105.** 18 U.S.C. § 1962(c).

**106.** *Sedima,* 473 U.S. at 495–96, 105 S.Ct. 3275.

**107.** *Ouaknine,* 897 F.2d at 82.

**108.** 18 U.S.C. § 1962(a).

**109.** *Ouaknine,* 897 F.2d at 83.

**110.** *Id.; Stolow v. Greg Manning Auctions, Inc.,* 258 F.Supp.2d 236, 245–46 (S.D.N.Y. 2003).

for Section 1962(b) claims. Section 1962(b) makes it unlawful to acquire or maintain, through a pattern of racketeering activity, an interest in or control over an enterprise.[111] Thus, to state a claim under Section 1962(b), a plaintiff must allege that he suffered an injury resulting from the defendant's acquisition or maintenance of its interest (i.e., an "acquisition or maintenance injury"), as distinct from an injury caused by the predicate acts alone.[112]

### 1. *Section 1962(a)*

■ The Complaint states in conclusory terms that Lateko derived income from its racketeering activities by charging fees for the banking services it provided on the accounts. But nowhere does it allege what Lateko did with that income, let alone that Lateko invested that money in the One Groupe enterprise and that its investment caused plaintiffs' injury.[113] As the Complaint does not allege an investment injury, plaintiffs' Section 1962(a) claim is dismissed.

### 2. *Section 1962(b)*

■ Nor does the Complaint allege an acquisition or maintenance injury. It al-leges neither that Lateko acquired or maintained an interest in the One Groupe enterprise nor that plaintiffs suffered an injury as a result of such acquisition or maintenance. Accordingly, plaintiffs' Section 1962(b) claim is dismissed.

### 3. *Section 1962(c)*

■ In contrast, plaintiffs sufficiently have alleged that Lateko's Section 1962(c) violation caused their injuries.

The "by reason of" language in Section 1964(c) requires "the plaintiff [to] plead and prove that the violation not only was the logical, or 'but for,' cause of the injury but also was its legally cognizable, or proximate, cause."[114] This Circuit has a two-step test for deciding the issue of proximate cause.[115] First, the injury must be a direct result of the alleged violation, not the result of a non-RICO violation.[116] Second, the plaintiff's injury must be reasonably foreseeable.[117] "[T]he reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise."[118]

Here, plaintiffs assert that Lateko provided a master account system which gave the One Groupe Defendants unlimited access to plaintiffs' funds. This unlimited

---

**111.** 18 U.S.C. § 1962(b).

**112.** *E.g., Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996), *vacated on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Stolow,* 258 F.Supp.2d at 246.

**113.** The Complaint alleges that One Groupe is an enterprise. Cpt. ¶ 254.

**114.** *Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251, 257 (2d Cir.2004) (citing *Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

**115.** *Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir.2003) (citing *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 122–23 (2d Cir.2003)).

**116.** *See id.* (citing *Lerner,* 318 F.3d at 122–23).

**117.** *Id.* at 373–74 (citing *Lerner,* 318 F.3d at 123); *accord Lerner,* 318 F.3d at 123 ("Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'") (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994)).

**118.** *Baisch,* 346 F.3d at 374 (quoting *Lerner,* 318 F.3d at 124).

access, plaintiffs contend, allowed defendants to misappropriate money deposited into sub-accounts.[119] In addition, as account holders and investors in the scheme, plaintiffs plainly were the alleged targets of the One Groupe scheme. The Complaint therefore adequately alleges that Lateko's violation of Section 1962(c) caused plaintiffs' injuries.[120]

## D. *Pattern*

■ Defendant further argues that the Complaint fails to plead a pattern of racketeering activity.

RICO defines a "pattern of racketeering activity" as requiring the commission of "at least two acts of racketeering activity" within ten years.[121] The Supreme Court has interpreted this requirement to mean that the acts must be "related" and "amount to or pose a threat of continued criminal activity."[122] Continuity may be either open-ended (i.e., "past criminal conduct coupled with a threat of future criminal conduct") or close-ended (i.e., "past criminal conduct extending over a substantial period of time").[123]

### 1. *Close-ended continuity*

A close-ended pattern of racketeering activity involves "a series of related predicates extending over a substantial period of time."[124] Although courts consider a number of factors in determining whether close-ended continuity exists, duration is the most important factor.[125] The Second Circuit "has never found a close-ended pattern where the predicate acts spanned fewer than two years."[126]

Here, the Complaint alleges predicate acts by Lateko during the six-month period between February 2002 and July 2002, making it unlikely that there is close-ended continuity. But it is unnecessary to decide the issue, as the Complaint sufficiently pleads an open-ended pattern.

### 2. *Open-ended continuity*

Unlike close-ended continuity, open-ended continuity does not require a showing that the predicate acts extended over a substantial period of time. Instead, the plaintiff "must show that there was a threat of continuing criminal activity be-

---

**119.** *See* Cpt. ¶ 169 (Lateko "provided a tiered account system that gave the Defendants unauthorized control of Plaintiffs' money, which, in turn, allowed Defendants to filter the funds fraudulently obtained from Plaintiffs out of the accounts held by certain Defendants at Defendant LATEKO Bank, undetected.").

**120.** Although the intricacies of the tiered account system are not apparent at this stage, the Complaint alleges that money was deposited into sub-accounts only after an OSGold account holder exchanged OSGold into hard currency. It follows that a plaintiff who never exchanged OSGold into hard currency never would have had funds deposited into the Lateko tiered account system. If this was the case, then Lateko's alleged predicate acts would not have caused that plaintiff's losses. Lateko's conduct arguably would have caused the losses only of those plaintiffs whose funds entered the tiered account system and were lost as a result.

**121.** 18 U.S.C. § 1961(5).

**122.** *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

**123.** *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir.2004).

**124.** *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

**125.** *First Capital Asset Mgmt. v. Brickelbush, Inc.*, 150 F.Supp.2d 624, 634 (S.D.N.Y.2001); *see also First Capital Asset Mgmt.*, 385 F.3d at 182.

**126.** *First Capital Asset Mgmt.*, 385 F.3d at 181; *see also id.* ("[W]hile two years may be the *minimum* duration necessary to find close-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a close-ended pattern.") (emphasis in original).

yond the period during which the predicate acts were performed."[127] "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case."[128]

Several factors favor plaintiffs here. First, the history of the scheme suggests that it posed a continuing threat. According to the Complaint, OSGold was the continuation of a different scheme, Cash Over Time, whose members were transferred to OSGold in order to prevent Cash Over Time from crashing. This suggests the possibility that the One Groupe defendants developed new schemes in order to prevent the collapse of old schemes, a characteristic that is not surprising in view of the nature of Ponzi schemes.

Second, the OSGold/OSOpps scheme allegedly did not end even after accounts were frozen. The defendants allegedly continued the scheme by, among other things, (1) misrepresenting to account holders and investors that their funds would be returned, (2) defrauding investors of additional funds under the guise of a program designed to recover money lost in the scheme, and (3) using tactics to prevent account holders and investors from pursuing legal action. These alleged acts were not simply an effort to cover up or conceal past conduct, but were addition-

al acts of fraud that may have caused additional injuries. Even at the time this lawsuit was filed in November 2002, it was unclear whether the One Groupe scheme had wound to a close.

Finally, Lateko itself allegedly may have had a role in the ongoing scheme. As late as July 18, 2002—after OSGold and OSOpps accounts were frozen and just four months prior to the commencement of this action—Lateko allegedly discussed with Card Accounts future issuances of debit cards and transferred money for that company.[129]

Lateko argues that there is no openended continuity because the threat has ended. It points to allegations that defendant Reed has fled the country[130] and that the investment relationship among the plaintiffs, as distinct from the negotiating relationship, ended sometime between May and July 2002, well before the litigation commenced in November 2002.[131] These arguments, however, are not persuasive.

First, Reed's having fled the country to avoid facing a lawsuit and perhaps worse does not give the defendants a free pass to avoid RICO liability. Indeed, the purpose for allowing plaintiffs to show a pattern based upon a *threat* of continuity is that "[o]ften a RICO action will be brought before continuity can be established [by a series of predicate acts extending over a substantial period of time]."[132] According-

---

127. *First Capital Asset Mgt.*, 385 F.3d at 180 (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999)).

128. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

129. *See* Cpt. ¶ 183 (email from Ginter to Card Accounts employee dated July 18, 2002 stating, "We have transferred the money from the account ... and some money to your account. Girls do this job, so don't worry. Sooner or later we transfer them all.... We have got a very polite notification from Europay.... They don't want us to sell anonymous cards. We will think what will do in the future and let you know.").

130. *See id.* ¶ 4.

131. *See, e.g., id.* ¶ 3 ("Then suddenly, in July 2002, the OneGroupe [*sic* ] house of cards collapsed—just two weeks shy of the maturity date for the 12–month OSOpps investment programs ..."); *id.* ¶ 70 ("On or about May 2002, approximately two weeks before the 12–month OSOpps program was set to expire and One Groupe would be faced with thousands of investor demands ..., OSOpps and OSGold mysteriously suspended its [*sic* ] activities ...").

132. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

ly, "[a]n analysis of the threat of continuity cannot be made solely from hindsight." [133] Instead, courts take into account whether the predicate acts posed a threat at the time of their occurrence.[134]

Nor is Lateko's suggestion that the investment relationship ended by July 2002 persuasive. As explained above, defendants allegedly perpetuated old schemes by merging them into new schemes. Moreover, Lateko allegedly discussed with Card Accounts future issuances of debit cards and transferred money for that company even after OSGold and OSOpps accounts were frozen.

The Complaint therefore adequately alleges a pattern of racketeering.

### E. *Other Elements Under Section 1962*

Lateko further argues that the Complaint fails to allege other elements of the RICO statute. For the reasons discussed below, its arguments fail.

#### 1. *Section 1962(c)*

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." [135] In *Reves v. Ernst & Young*,[136] the Supreme Court concluded that the terms "to conduct" and "participate" require "some degree of direction" in the affairs of the enterprise.[137] It further determined that "[t]he 'operation or management' test expresses this requirement in a formulation that is easy to apply." [138] Thus, "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.' " [139]

The Second Circuit, in *First Capital Asset Management*, recently observed that "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." [140] It stated that "outsiders who associate with an enterprise will be liable if they 'participate in the operation or management of the enterprise itself.' To put it another way, outsiders, like all other people, will be liable [under RICO] ... if their actions satisfy the operation or management test." [141] The court further stated that "it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise." [142] In addition, where, as here, a defendant's "liability is also premised on a RICO conspiracy theory ..., the standard

133. *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.), *cert. denied*, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991); *accord A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F.Supp.2d 485, 508 (S.D.N.Y. 1998).

134. *E.g.*, *A. Terzi Prods.*, 2 F.Supp.2d at 508 (measuring threat of continuity at the time defendants' alleged predicate acts occurred); *Morrow v. Black*, 742 F.Supp. 1199, 1207 (E.D.N.Y.1990) (same).

135. 18 U.S.C. § 1962(c).

136. 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

137. *Id.* at 179, 113 S.Ct. 1163.

138. *Id.*

139. *First Capital Asset Mgmt.*, 385 F.3d at 176 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir.1994)).

140. *Id.*

141. *Id.* at 178 (quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1349 n. 2 (8th Cir.1997)).

142. *Id.*

... appl[ied] to [the defendant] is even more relaxed." [143]

Here, plaintiffs sufficiently allege that Lateko participated in the operation of the One Groupe scheme. According to the Complaint, Lateko took part in operating the banking aspects of the scheme, such as creating master accounts, issuing debit cards, providing software to support mailings to cardholders, and handling various other transactions associated with the accounts. The Complaint suggests awareness of the fraudulent nature of the scheme—especially the allegations that Lateko knew of Card Accounts' involvement in prior frauds when that company first approached it and Lateko's false denial of any relationship with Card Accounts. Accordingly, the Complaint adequately alleges a violation of Section 1962(c).

### 2. *Section 1962(d)*

■ Section 1962(d) makes it unlawful for any person to conspire to violate Sections 1962(a), 1962(b), and 1962(c).[144] To be guilty under Section 1962(d), the "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." [145] "In the civil context, a plaintiff must allege that the defendant 'knew about and agreed to facilitate the scheme.' " [146]

As discussed above, the Complaint adequately alleges that Lateko knew about and agreed to facilitate the scheme. La-

teko's letter to MasterCard suggests that Lateko investigated and uncovered Card Accounts' involvement in other frauds when that company first approached it, and Lateko's false denial of any relationship with Card Accounts gives rise to an inference of a guilty mind. Furthermore, plaintiffs have alleged that Lateko committed various acts in furtherance of the scheme. Accordingly, the Complaint adequately states a claim under Section 1962(d).

### IV. State Law Claims

The Complaint alleges state law claims against Lateko for common law fraud, aiding and abetting common law fraud, negligent misrepresentation, breach of fiduciary duty, and imposition of a constructive trust. Lateko moves to dismiss these claims under Rule 9(b) for failure to plead fraud with particularity and under Rule 12(b)(6) for failure to state a claim.[147]

### A. *Common Law Fraud and Breach of Fiduciary Duty*

■ The Complaint alleges common law fraud based on Lateko's failure to disclose that the master account system gave certain defendants unlimited access to sub-accounts.[148]

The elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [149] Where an omis-

---

**143.** *Id.*

**144.** 18 U.S.C. § 1962(d).

**145.** *Baisch*, 346 F.3d at 376 (quoting *Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)).

**146.** *Id.* (citing *Salinas*, 522 U.S. at 66, 118 S.Ct. 469).

**147.** The parties' briefs assume that New York law applies to plaintiffs' state law claims.

Such "implied consent ... is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir.2004) (citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir.2000)).

**148.** *See* Cpt. ¶ 141.

**149.** *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir.1999) (citing *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)); *accord Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994).

sion rather than a misrepresentation is alleged, the plaintiff must demonstrate that the defendant had a duty to disclose.[150] A claim for common law fraud must meet the heightened pleading requirements of Rule 9(b).

A party to a business transaction has a duty to disclose in three situations: "first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."[151] Plaintiffs allege a duty to disclose based on the second and third situations.

The Complaint alleges no facts suggesting the existence of a fiduciary or other relationship between plaintiffs and Lateko. Plaintiffs do not allege that they were customers of Lateko or that they interacted with Lateko other than by making ATM withdrawals. Instead, it was Reed and the defendant Exchange Makers who held accounts at Lateko and purchased the debit cards for those accounts, which they then distributed to the plaintiffs.

Nor may a duty to disclose be inferred based on superior knowledge. Such a duty arises in the context of parties entering into a transaction where one party's superior knowledge renders the transaction without disclosure unfair.[152] Here, there is no indication of a transaction between Lateko and the plaintiffs other than the withdrawals made at ATM machines. These transactions, however, are the not the ones that plaintiffs allege were rendered unfair by a failure to disclose. Rather, the transactions that plaintiffs take issue with are those between plaintiffs and the One Groupe Defendants, with whom they entrusted their money.

Accordingly, plaintiffs' claims for common law fraud and breach of fiduciary duty are dismissed.

B. *Aiding and Abetting Common Law Fraud*

■ The elements of aiding and abetting liability are: (1) a violation by the primary wrongdoer, (2) knowledge of the wrongful conduct by the aider and abettor, and (3) substantial assistance by the aider and abettor in achieving the violation.[153]

Lateko does not dispute that the plaintiffs have alleged a violation by the primary wrongdoers. It disputes the sufficiency of the allegations with respect to the second and third elements—knowledge and substantial assistance.

1. *Knowledge*

■ The Complaint alleges facts constituting strong circumstantial evidence of

---

**150.** *E.g., Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1483 (2d Cir.1995).

**151.** *Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (internal citations and quotation marks omitted); *accord Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1483–84 (2d Cir. 1995); *Manela v. Garantia Banking,* 5 F.Supp.2d 165, 178 n. 118 (S.D.N.Y.1998).

**152.** *E.g., P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.,* 301 A.D.2d 373, 378, 754 N.Y.S.2d 245, 252 (2003); *Williams v. Bank Leumi Trust Co.,* 1998 WL 397887, at *5 (S.D.N.Y. July 15, 1998); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.,* 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996).

**153.** *E.g., Filler v. Hanvit Bank,* 339 F.Supp.2d 553, 557 (S.D.N.Y.2004) (citing *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir. 2000)); *Steed Fin. LDC v. Laser Advisers, Inc.,* 258 F.Supp.2d 272, 282 (S.D.N.Y.2003) (citing *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452, 470 (S.D.N.Y.2001)).

conscious misbehavior or recklessness. Lateko allegedly responded to an inquiry from MasterCard by falsely denying any relationship with Card Accounts, One Groupe or OSGold.[154] Moreover, it continued its relationship with Card Accounts even after the scheme started suspiciously to fall apart. On July 18, 2002, at least a few days after One Groupe had frozen OSGold and OSOpps accounts and publicly conceded as much on its website,[155] Lateko sent an email to Card Accounts confirming a transfer of money and discussing future issuances of anonymous debit cards.[156]

Lateko's apparently false denials to a possibly important business partner and its continued cooperation with Card Accounts even after the scheme suspiciously began to collapse tend to show conscious disregard or recklessness and give rise to a strong inference of fraudulent intent.

Accordingly, the Complaint sufficiently alleges Lateko's knowledge of the primary wrongdoing.

### 2. Substantial Assistance

An aider and abettor provides substantial assistance when he or she "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." [157]

Here, plaintiffs allege that Lateko assisted the fraud by providing the tiered account system to which numerous debit cards were linked. The tiered account system, plaintiffs allege, "gave the Defendants unauthorized control of Plaintiffs' money, which, in turn, allowed Defendants to filter the funds fraudulently obtained from Plaintiffs out of the accounts held by certain Defendants at Defendant LATEKO Bank." [158] These allegations are sufficient to show substantial assistance. Accordingly, Lateko's motion to dismiss plaintiffs' claim for aiding and abetting common law fraud is denied.

### C. Negligent Misrepresentation

Plaintiffs' negligent misrepresentation claim rests on the alleged omissions that underlie its common law fraud claim and the assertion that negligently misrepresented the legitimacy and viability of the One Groupe scheme by associating itself and the CIRRUS symbol with that scheme.

"It is settled New York law that the elements of negligent misrepresentation are: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage." [159] In addition, the action requires

---

**154.** As the letter from Lateko's president is dated September 13, 2002—after the scheme began to unravel—it is possible that he intended to say that Lateko had severed a relationship with Card Accounts upon discovering the company's shady past, rather than that Lateko had never had a relationship with the company. However, this is a fact issue. For purposes of this motion, the Court draws all reasonable inferences in the plaintiffs' favor.

**155.** Although the Complaint does not identify the precise date on which One Groupe suspended its operations, it alleges that, in response to inquiries by account holders, Reed posted a message to the One Groupe website on or about July 15, 2002 to explain the sudden cessation of operations. See Cpt. ¶ 213. The posting urged account holders to

"check back in ninety (90) days" and reassured them that One Groupe was working with INT to reach a resolution. Id.

**156.** Id. ¶ 183.

**157.** Cromer Fin. v. Berger, 137 F.Supp.2d 452, 470 (S.D.N.Y.2001) (quoting Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)); accord Filler v. Hanvit Bank, 339 F.Supp.2d 553, 557 (S.D.N.Y.2004).

**158.** Cpt. ¶ 169.

**159.** Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir.2003) (citing White v. Guarente, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315 (1977)).

that "(5) the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care." [160]

### 1. *Plaintiffs' Negligent Misrepresentation Claim Sounds in Fraud*

A threshold question is whether plaintiffs' negligent misrepresentation claim against Lateko sounds in fraud and therefore is subject to the pleading requirements of Rule 9(b). [161]

In dismissing the second amended complaint, this Court held that plaintiffs' negligent misrepresentation claim incorporated the fraud claims by reference, thus rendering it subject to Rule 9(b). [162] The Court instructed plaintiffs that any amended pleading should distinguish between claims that rely upon proof of *scienter* and those that do not if plaintiffs did not want their negligent misrepresentation claim to be scrutinized under Rule 9(b). [163]

As far as the Court can tell, plaintiffs have attempted to avoid the application of Rule 9(b) to their negligent misrepresentation claim by two means. First, in their claim for negligent misrepresentation (count V of the Complaint), plaintiffs state: "Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 241 of this Third Amended Complaint (with the exception of those allegations sounding in fraud that are contained in paragraphs 1 through 6, 39 through 47, 54, 135, 142, 153, 158, 162, 163, 165, 168, 170, 192, 196, 197, 199, 203, 205 and 206)." [164]

Close examination reveals that what plaintiffs did was to exclude from this claim those paragraphs that contain the words "fraud" or "defraud." This approach, however, is too simplistic, as the substance of what remains nevertheless sounds in fraud. [165] For example, in the paragraphs not stricken, plaintiffs allege, *inter alia*, that Lateko's failure to disclose the nature of the tiered account structure was "motivated by greed" and "in conscious and reckless disregard of their legal and contractual obligations to plaintiffs;" [166] that Lateko sold anonymous debit cards to individuals of "dubious character ... with knowledge that the ultimate use was illegal" and "in conscious and reckless disregard of their legal and contractual obligations;" [167] that Lateko "knew of the general nature of the activities carried on by the One Groupe Entities" (presumably, the fraudulent nature of those activities); [168] and that Lateko "was conscious of its wrongdoing" [169] but despite its "consciousness of its wrongdoing" [170]

**160.** *Id.* (citing *White*, 43 N.Y.2d at 363, 401 N.Y.S.2d at 478, 372 N.E.2d 315).

**161.** *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004) (heightened pleading standard of Rule 9(b) applies to a claim predicated on averments of fraud, even though fraud may be an element of that claim).

**162.** *OSRecovery, Inc. v. One Groupe Int'l Inc.*, 2004 WL 238035, at *1 (S.D.N.Y. Feb. 9, 2004).

**163.** *Id.* at *2.

**164.** Cpt. ¶ 281.

**165.** *See Rombach*, 355 F.3d at 172 (complaint sounds in fraud where the "wording and imputations of the complaint are classically associated with fraud: that the ... statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued") (emphasis in original).

**166.** Cpt. ¶ 141.

**167.** *Id.* ¶ 140.

**168.** *Id.* ¶ 167.

**169.** *Id.* ¶ 209.

**170.** *Id.* ¶ 210.

continued to provide the other defendants with debit cards and control over the master account system. Interspersed among these and other allegations sounding in fraud are at least two sentences alleging that Lateko "negligently misrepresented" the legitimacy of the One Groupe Entities.[171] These two sentences alone, however, are not enough to overcome the fact that the essence of the Complaint, even excluding the paragraphs containing the words "fraud" and "defraud," is plainly fraud.[172]

Nor are these problems cured by the second manner in which plaintiffs have attempted to avoid making their negligence claim sound in fraud—the inclusion, in count V, of a summary of the defendants' alleged misrepresentations and omissions. The Complaint asserts that the defendants breached their "fiduciary duties to Plaintiffs by making false and/or misleading statements, and/or material omissions of fact," and it then goes on to identify the particular omissions made by Lateko.[173] But even this sentence sounds in fraud, since the words "false" and "misleading" are "classically associated with fraud."[174]

Accordingly, plaintiffs' negligent misrepresentation claim sounds in fraud and therefore is subject to Rule 9(b).

### 2. Plaintiffs' Negligent Misrepresentation Claim Does Not Satisfy Rule 9(b)

■ Plaintiffs' negligent misrepresentation claim does not pass muster under Rule 9(b). The Complaint does not identify with particularity any misrepresentations made by Lateko to the plaintiffs, nor does it allege facts giving rise to a duty to disclose. The negligent misrepresentation claim therefore is dismissed.

### D. Constructive Trust

■ Imposition of a constructive trust requires a showing "that a party hold property 'under such circumstances that in equity and good conscience he ought not to retain it.'"[175] Courts consider the following factors in determining whether to impose a constructive trust: "(1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment."[176] These factors, however, should not be rigidly construed.[177] "In pleading as in proof, a constructive trust is a flexible device and must not be bound by an 'unyielding formula.'"[178]

---

171. *Id.* ¶¶ 171, 193.

172. *See Rombach*, 355 F.3d at 172 (efforts to characterize claims by the label used in the pleading is "unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied") (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 2 (9th Cir.1996)).

173. Cpt. ¶ 284.

174. *Rombach*, 355 F.3d at 172.

175. *Golden Budha Corp. v. Canadian Land Co., N.V.*, 931 F.2d 196, 202 (2d Cir.1991) (citing *Simonds v. Simonds*, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 364, 380 N.E.2d 189 (1978)).

176. *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 646 (2d Cir.2004) (citing *Caballero v. Anselmo*, 759 F.Supp. 144, 147 (S.D.N.Y.1991)).

177. *Golden Budha Corp.*, 931 F.2d at 202 ("[A]lthough the factors are useful in many cases constructive trust doctrine is not rigidly limited.") (quoting *Simonds*, 45 N.Y.2d at 241, 408 N.Y.S.2d at 363, 380 N.E.2d 189).

178. *Id.* (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 389, 122 N.E. 378, 381 (1919)).

Here, plaintiffs allege that money was transferred on their behalf into accounts at Lateko, but that the accounts were frozen. Plaintiffs therefore have adequately pled a claim for imposition of a constructive trust.[179]

### V. Conclusion

Lateko's motion to dismiss the third amended complaint is granted to the extent that the claims of foreign plaintiffs, as well as the second count, insofar as it asserts claims under Sections 1964(a) and 1964(b), the third (common law fraud), fifth (negligent misrepresentation), and sixth (breach of fiduciary) counts, are dismissed as against Lateko. Lateko's motion to dismiss is otherwise denied.

SO ORDERED.

**179.** Finally, Lateko contends that the entire Complaint should be dismissed under Federal Rule of Civil Procedure 10(a), which requires that the title of a complaint include the names of all the parties. Lateko does not argue that the caption fails to identify the parties—an issue which this Court has already addressed. *See Osrecovery, Inc. v. One Groupe Int'l, Inc.,* 2003 WL 23313 (S.D.N.Y. Jan. 3, 2003). Instead, the substance of Lateko's argument is that the number of plaintiffs identified throughout the Complaint is in "bewildering flux," varying between 1,043 and approximately 1,200. Lateko Mem. 8–9. As this is not a basis for dismissing a complaint under Rule 10(a), and Lateko has not identified any other authority requiring dismissal on this basis, the motion is denied.