10-3040-cv
MLSMK Investment Co. v. JP Morgan Chase & Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  May 25, 2011          Final Submission:  June 10, 2011
Decided: July 7, 2011)

Docket No. 10-3040-cv

-------------------------------------

MLSMK INVESTMENT COMPANY,

Plaintiff-Appellant,

- v -

JP MORGAN CHASE & CO., JP MORGAN CHASE BANK, NA,

Defendants-Appellees.

-------------------------------------

Before:   McLAUGHLIN, POOLER, and SACK, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Barbara S. Jones, Judge) dismissing the plaintiff's complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  By summary order dated June 6, 2011, we affirmed the dismissal of the plaintiff's New York state-law claims.  We did not, however, resolve the plaintiff's appeal from the dismissal of its remaining, federal claim that the defendants had conspired with Bernard L. Madoff in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(d) and 1964(c), thereby injuring the plaintiff.  We now conclude that the heretofore unresolved claim is precluded by section 107 of the

Private Securities Litigation Reform Act, 18 U.S.C. § 1964(c). We therefore affirm the district court's dismissal of that claim.

AFFIRMED.

HOWARD KLEINHENDLER, Wachtel & Masyr, LLP (Julian D. Schreibman, Sara G. Spiegelman, of counsel), New York, NY, for Plaintiff-Appellant.

PATRICIA M. HYNES, Allen & Overy LLP (Andrew Rhys Davies, Laura R. Hall, of counsel), New York, NY, for Defendants-Appellees.

SACK, Circuit Judge:

This case arises out of the massive and now infamous Ponzi scheme[1] perpetrated by Bernard L. Madoff, which culminated abruptly with his arrest in December 2008 but whose aftershocks continue.

Between October and December 2008, the plaintiff, MLSMK Investment Company ("MLSMK"), invested $12.8 million with Madoff's investment company, Bernard L. Madoff Investment Securities ("BMIS"). The defendants, JP Morgan Chase & Co. ("JPMC") and JP Morgan Chase Bank, N.A. ("Chase Bank"), were, respectively, a trading partner for Madoff's apparently legitimate market-making business and the bank with which Madoff maintained the account for BMIS. MLSMK lost its $12.8 million

---

[1] A "Ponzi scheme" is one "in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 89 (2d Cir. 2002) (internal quotation marks omitted). For a description of the operations of the eponymous Charles Ponzi himself, see Cunningham v. Brown, 265 U.S. 1, 7-9 (1924).

investment when, on December 11, 2008, Madoff was arrested and his assets seized.

MLSMK subsequently filed this lawsuit in the United States District Court for the Southern District of New York alleging several New York state-law claims against the defendants. It also asserted a federal claim contending that the defendants had conspired with Madoff to "fleece" his victims, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(d) and 1964(c). In that connection, MLSMK alleges that by late summer 2008, the defendants became suspicious of Madoff's business activities and therefore undertook a "due diligence" investigation into Madoff's activities, and that the investigation revealed to the defendants that Madoff's investment business was a thoroughly fraudulent enterprise. Nevertheless, MLSMK asserts, the defendants -- eager to continue receiving the substantial fees they derived from Madoff's market-making and banking activity -- continued to trade with and provide banking services to him. MLSMK asserts that by failing to freeze Madoff's accounts, the defendants became liable for conspiracy to violate RICO by aiding and abetting Madoff's breach of fiduciary duty, commercial bad faith, and negligence.

The district court (Barbara S. Jones, <u>Judge</u>) dismissed the plaintiff's complaint in its entirety, concluding that the complaint did not adequately plead any of the claims purportedly contained therein. We have affirmed that court's dismissal of

3

the plaintiff's state-law claims for aiding and abetting breach of fiduciary duty, commercial bad faith, and negligence.  See MLSMK Inv. Co. v. JP Morgan Chase & Co. ("MLSMK I"), No. 10-3040-cv, 2011 WL 2176152, 2011 U.S. App. LEXIS 11425 (2d Cir. June 6, 2011) (summary order).  With regard to the remaining claim brought under RICO, addressing an issue of first impression in this Court, we conclude that the claim also must be dismissed, because it is barred by section 107 of the Private Securities Litigation Reform Act (the "PSLRA"), 18 U.S.C. § 1964(c).  We therefore affirm that portion of the district court's judgment that remains on appeal.

**BACKGROUND**

The following statement of facts is drawn from the plaintiff's complaint.  As is required on appeal from a successful motion to dismiss in the district court, we accept as true all well-pleaded factual allegations in the complaint and draw all inferences in the plaintiff's favor.  See Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Ger., 615 F.3d 97, 114 (2d Cir. 2010), cert. denied, 131 S. Ct. 1502 (2011); see also Harris v. Mills, 572 F.3d 66, 71–72 (2d Cir. 2009) (reciting the Supreme Court's guidance in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), that we need not credit legal conclusions couched as factual statements or "threadbare recitals of the elements of a cause of action,

4

supported by mere conclusory statements" (alterations and internal quotation marks omitted)).

This suit arises out of Bernard L. Madoff's infamous and long-running Ponzi scheme. MLSMK Investment Company is a Florida partnership, all of whose partners are citizens of that state. JPMC is a global financial services firm providing a panoply of investment banking and financial services to businesses and individuals; Chase Bank, a U.S.-based commercial bank, is a wholly owned subsidiary of JPMC. Both are Delaware corporations with their principal places of business in New York City.[2]

The general contours of Bernard L. Madoff's businesses and transgressions are notorious. For about forty years preceding his December 2008 arrest, he owned and operated BMIS, a broker-dealer business based in Manhattan. BMIS operated three separate entities providing distinct services: investment-advisory services, market-making services, and proprietary trading. BMIS's market-making business, of which the defendant JPMC was a trading partner, is generally thought (and is conceded by MLSMK) to have been legitimate,[3] but BMIS's investment-

[2] The subject matter jurisdiction of the district court was premised on "both federal question and diversity jurisdiction," pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1). J.A. 7 (Compl. ¶ 9).

[3] According to the complaint, Bear Stearns was among Madoff's chief market-making trading partners until JPMC purchased the investment house in March 2008. MLSMK asserts that JPMC thereafter kept in place Bear Stearns's system, which "automatically defaulted to BMIS as the market maker." J.A. 9

5

advisory business, according to MLSMK, was "entirely fictional" and central to Madoff's criminal enterprise. J.A. 10 (Compl. ¶ 20). Madoff accepted funds from individual and corporate clients promising to invest them in the investment-advisory entity through which the clients would earn returns of "up to 10-12% a year." Id. at 11 (Compl. ¶ 22). Madoff never made those investments. Instead, he used later-invested money to pay "returns" to other investors and to fund his lavish lifestyle: a classic Ponzi scheme.[4]

Having received monthly statements from BMIS for June through September of 2008 indicating a 10 to 12 percent annualized return on previously made investments, MLSMK "caused $12.8 million to be transferred to BMIS by wiring the funds to BMIS'[s] account at Chase Bank in New York" between October 6, 2008, and December 5, 2008. Id. at 7 (Compl. ¶ 5).

MLSMK alleges that all of the money Madoff received "in the [fraudulent] investment advisory business [was] deposited into accounts he held at [defendant] Chase Bank," id. at 11 (Compl. ¶ 24), and that, because the investor's account number was required to be written on the face of the check, Chase Bank

_____

(Compl. ¶ 16). The plaintiff contends on information and belief that "[t]his was an unusual accommodation" for which Madoff paid Bear Stearns (and later JPMC) "substantial fees." Id.

[4] On December 11, 2008, Madoff was arrested and charged with securities fraud. The SEC froze all of his and BMIS's assets. On March 12, 2009, Madoff pleaded guilty to an eleven-count criminal information and admitted that BMIS's investment-advisory business was a Ponzi scheme and that he had "never executed a single trade on behalf of any client" of that business. J.A. 18 (Compl. ¶¶ 45-46).

6

knew that the funds were "not Madoff's or BMIS'[s] but rather belonged to the victim and were being received by BMIS as a fiduciary," id. at 12 (Compl. ¶ 25). MLSMK asserts that, for many years prior to 2008, BMIS's Chase Bank account "had an average balance of several billion dollars." Id. (Compl. ¶ 27). With the advent of the global financial crisis in September 2008, however, the account balance "often dropped to near zero." Id.

MLSMK alleges that JPMC, in addition to operating as a market-making trading partner for BMIS, developed a derivative product "specifically for use with Madoff-related investments." Id. at 14 (Compl. ¶ 33). JPMC's product, a note it offered primarily to European investors, guaranteed a return of three times the earnings of a fund offered by the Fairfield Greenwich Group, one of Madoff's so-called "feeder fund[s]." Id. (Compl. ¶¶ 34-35) (internal quotation marks omitted).[5] The Fairfield Greenwich Group's fund, known as the "Sentry Fund," had assets totaling $7.5 billion, 95 percent of which was invested with BMIS.[6] Id. at 14-15 (Compl. ¶ 35). According to the complaint, JPMC hedged against the risk assumed by its derivative product by depositing three times the face amount of the notes -- up to $250

[5] MLSMK alleges that the Fairfield Greenwich Group "directed clients to Madoff's investment advisory business . . . and received hefty fees." J.A. 14 (Compl. ¶ 34). For example, "[i]n 2007, Fairfield reported $250 million in revenue, $160 million of which came from Madoff." Id.

[6] The Sentry Fund was made up of three smaller funds: the Fairfield Sentry fund, the Greenwich Sentry fund, and the Greenwich Sentry Partners fund. The complaint refers to these funds collectively as the "Sentry Fund."

million by the summer of 2008 -- directly into the Madoff-linked Sentry Fund. Consequently, if the Sentry Fund did well -- as it was expected to do, based on Madoff's consistent 10 to 12 percent (bogus) returns -- JPMC's returns "would offset its obligations on the notes." Id. at 15 (Compl. ¶ 35). According to the plaintiff, this Madoff-invested fund continued to report gains of five percent "due to the returns Madoff was showing on the money invested with BMIS," even as the financial markets were crumbling in the summer and early fall of 2008. Id. (Compl. ¶ 36).

MLSMK alleges that the Sentry Fund's consistently strong returns despite the market mayhem triggered JPMC's suspicion about Madoff's results. The investment company therefore "embarked on a due diligence investigation of Madoff's operations."[7] Id. The complaint alleges that "[a]s a result of its investigation, in or about September 2008, [JPMC] quietly liquidated" its investment in the Madoff-related fund, although

---

[7] The complaint offers the details of the investigation on information and belief and based upon the plaintiff's understanding of "standard industry practice." J.A. 15 (Compl. ¶ 37). The complaint alleges that JPMC representatives "met with Madoff to discuss his operations" and "had access to" the former Bear Stearns trading desk, and employees within the company who regularly traded with BMIS. Id. (Compl. ¶¶ 37-38). MLSMK asserts that the investigative "team also had access to" and, "[u]pon information and belief, . . . accessed and reviewed . . . Madoff's Chase [Bank] account records," which "showed consistent huge cash positions until the middle of 2008." Id. at 16 (Compl. ¶ 39). MLSMK has provided neither the date nor the time of the alleged meeting with Madoff. Indeed, MLSMK acknowledges that it has no actual knowledge of whether the meeting or diligence investigation did in fact take place, let alone where or when. MLSMK alleges only that it consulted with certain unnamed experts who advised that such investigations were standard practice.

it remained liable on its own derivative product. Id. at 16 (Compl. ¶ 40). By that time, the defendants "had unequivocally concluded that Madoff's reported returns were false and illegitimate and that the only way to protect its own capital . . . was to liquidate the entirety of its Madoff-related investments." Id.; see also id. ("In short, by September 2008, [JPMC] knew that Madoff's business was a fraud."). The plaintiff asserts that "in January 2009, [JPMC] publicly admitted that the withdrawal of its investment was based on concerns and questions raised during the due diligence investigation of Madoff." Id.

Finally, the complaint alleges that, despite the defendants' actual knowledge that Madoff's investments were a sham, and that Madoff was diverting customer funds, JPMC "continued to trade with Madoff's market making business," and Chase Bank "continued to provide Madoff with banking services." Id. at 16–17 (Compl. ¶ 41). According to the plaintiff, the defendants continued these activities because Madoff's account "was very lucrative, having provided Chase for years with substantial earnings and fees from the large cash balances in the account." Id. at 17 (Compl. ¶ 41). The plaintiff asserts that "[r]ather than protect other victims of Madoff's fraud as it had already protected itself, Chase chose not only to protect Madoff, but [also] to partner with him in the fleecing of his victims[] by providing exactly the same range of services, for substantial fees, after learning of his criminal enterprise, as it had before its investigation." Id.

9

On April 23, 2009, MLSMK filed a complaint in the United States District Court for the Southern District of New York asserting five claims against JPMC and Chase Bank. Four of the five causes of action -- aiding and abetting breach of fiduciary duty, commercial bad faith, and two counts of negligence -- were pleaded under New York law. The fifth -- denominated "Count One" in the complaint -- alleged that, from about September 2008 to December 2008, the defendants conspired to violate RICO, 18 U.S.C. §§ 1962(d) and 1964(c),[8] by "knowingly and purposely conspir[ing]" with Madoff to further Madoff's racketeering enterprise by "providing Madoff with banking services that were integral to the functioning of the

---

[8] 18 U.S.C. § 1964(c) provides, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . ."

In this case, the plaintiff asserts that the defendants violated section 1962(d), the criminal RICO statute. That section provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Those subsections, in turn, outlaw

> (a) the use of income "derived . . . from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern of racketeering activity"; [and] (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity."

GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995) (quoting 18 U.S.C. § 1962(a)-(c)), cert. denied, 518 U.S. 1017 (1996).

10

racketeering enterprise" and by engaging in various RICO "predicate acts," including "numerous interstate wire communications," for which the defendants were "paid substantial fees . . . derived entirely from Madoff's racketeering enterprise." Id. at 23 (Compl. ¶ 67). MLSMK seeks, inter alia, an award of treble damages under RICO for this allegedly illegal activity.

On June 5, 2009, the defendants moved to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the plaintiff did not adequately plead the required elements of its claims, and, as to the RICO conspiracy cause of action, that the claim is barred by section 107 of the PSLRA.

By order dated July 14, 2010, the district court granted the defendants' motion and dismissed the complaint in its entirety. The district court dismissed the RICO claim because, the court concluded, MLSMK failed adequately to plead the defendants' requisite state of mind.

MLSMK now appeals. In a summary order dated June 6, 2011, we affirmed the dismissal of MLSMK's four state-law claims for substantially the reasons relied upon by the district court; however, we retained jurisdiction over the RICO claim. See MLSMK I, 2011 WL 2176152, at *2-*3, 2011 U.S. App. LEXIS 11425, at *3-*6. This opinion therefore addresses only the viability of MLSMK's RICO conspiracy claim.

## DISCUSSION

11

"We review de novo the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011) (internal quotation marks omitted).

Chase Bank and JPMC argued before the district court, and continue to assert on appeal, that MLSMK's RICO conspiracy claim is precluded by section 107 of the PSLRA, 18 U.S.C. § 1964(c), presenting a question of first impression for this Court. The district court judges in our Circuit that have addressed it are divided. The district court in the instant case avoided the issue altogether by dismissing MLSMK's RICO claim on the ground that the plaintiff had not adequately pled scienter, which is required when a plaintiff alleges a RICO claim based on fraudulent predicate acts. See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."); Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003). In light of the possibility that the plaintiff might seek in the district court to amend the complaint based on recently discovered evidence and then successfully replead scienter, we affirm the dismissal, instead, on the grounds that, in any event, section 107 of the PSLRA bars the plaintiff's RICO conspiracy claim. See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 488 F.3d 112, 134 (2d Cir. 2007) (stating that this Court

12

may "affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court" (internal quotation marks omitted)).

Section 107 of the PSLRA -- which was enacted as an amendment to the RICO statute and accordingly is often referred to as the "RICO Amendment" -- provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). As explained by the United States District Court for the Southern District of Texas, "[b]efore the RICO Amendment, a plaintiff could allege a private civil RICO claim for securities laws violations sounding in fraud because 'fraud in the sale of securities' was listed as a predicate offense." In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 618 (S.D. Tex. 2003) (citing Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999)). "Inasmuch as 'fraud in the sale of securities' was [, before the 1995 RICO Amendment,] a predicate offense in both criminal and civil RICO actions, plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages." Bald Eagle Area Sch. Dist., 189 F.3d at 327 (citation omitted).

The RICO Amendment changed the use of that tactic by barring civil RICO claims based on allegations of securities fraud. See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown,

13

*Rowe & Maw LLP*, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009) ("Section 107 of the PSLRA . . . bars private causes of action under RICO for predicate acts that describe conduct that would otherwise be actionable as securities fraud."); *see also* *Bald Eagle Area Sch. Dist.*, 189 F.3d at 327 ("The PSLRA amended RICO by narrowing the kind of conduct that could qualify as a predicate act."). As the plaintiff concedes, the purpose of the bar "was to prevent litigants from using artful pleading to bootstrap securities fraud cases into RICO cases, with their threat of treble damages." Appellant's Reply Br. 19; *accord* *Bald Eagle Area Sch. Dist.*, 189 F.3d at 327-28 (quoting the legislative history and explaining the purpose of the PSLRA).

But the scope of the RICO Amendment's bar is unsettled in this Circuit. The parties dispute whether it applies to all civil RICO claims predicated upon securities fraud, or if there is an exception where, as here, the plaintiff cannot bring a securities fraud claim against the defendant because the plaintiff alleges only an aiding and abetting claim, which cannot serve as a basis for a private right of action, *see* *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (concluding that section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), does not "impos[e] private civil liability on aiders and abettors" of securities fraud). The determinative question, then, is whether the RICO Amendment bars all RICO claims "that would have been actionable as fraud in the purchase or sale of securities," 18 U.S.C. §

14

1964(c), or only RICO claims in cases where that plaintiff could have asserted a fraud claim against the named defendant. That is, we must determine whether, as the defendants assert, the bar applies to "claims based on conduct that could be actionable under the securities laws even when the [particular] plaintiff . . . cannot bring a cause of action under the securities laws," Appellees' Br. 32 (quoting Thomas H. Lee, 612 F. Supp. 2d at 283) (internal quotation marks omitted); see Appellees' Supp. Br. 3-4, or whether, as MLSMK contends, the viability of a RICO claim turns on the "claims available against a particular defendant," Appellant's Reply Br. 19; see Appellant's Supp. Br. 5 ("A court must analyze whether the particular plaintiff has a cause of action sounding in securities fraud against the named defendant.").[9]

This Court has not weighed in on the question. The answers proffered by the district courts in this Circuit diverge, but at least three district court judges in this Circuit have accepted the argument made by the defendants here. In Fezzani v.

_____

[9] The parties also appear to agree that the RICO Amendment applies to mail fraud and wire fraud, in addition to ordinary securities fraud, when such claims "are based on conduct that would have been actionable as securities fraud." OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp. 2d 357, 368 (S.D.N.Y. 2005) (internal quotation marks omitted); see Bald Eagle Area Sch. Dist., 189 F.3d at 327 (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 746); Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd., 205 F. Supp. 2d 243, 248 (S.D.N.Y. 2002) ("In amending RICO, Congress was clear in stating that the PSLRA was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim." (internal quotation marks omitted)).

Bear, Stearns & Co., No. 99 Civ. 0793, 2005 WL 500377, 2005 U.S. Dist. LEXIS 3266 (S.D.N.Y. Mar. 2, 2005) (Richard C. Casey, Judge), the plaintiffs, who had asserted section 10(b) claims and RICO claims against several defendants, urged the court to interpret the RICO Amendment to permit a civil RICO claim based upon alleged predicate acts of aiding and abetting securities fraud. The district court rejected the plaintiff's "particularly narrow interpretation of the RICO [A]mendment," which would "permit RICO liability against any defendant not individually alleged to have committed securities fraud, despite [that defendant's] extensive reliance on others' securities fraud." Fezzani, 2005 WL 500377, at *4, 2005 U.S. Dist. LEXIS 3266, at *14. The court viewed this approach as "inconsistent with Congress's purpose" in enacting the law. Id.; see also S. Rep. 104-98, at 19 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 698 (describing Congress's intent "to eliminate securities fraud as a predicate act of racketeering in a civil RICO action"). The court specifically rejected the contention -- also pressed by MLSMK here -- that because securities fraud laws do not create a private cause of action for aiding and abetting securities, mail, or wire fraud, a plaintiff should be able to pursue a RICO claim against an alleged aider and abetter of securities fraud. Fezzani, 2005 WL 500377, at *4, 2005 U.S. Dist. LEXIS 3266, at *15. The court expressed concern that if it were to accept the plaintiffs' interpretation, a plaintiff could too easily manipulate a complaint to skirt the RICO Amendment's limitations:

16

> Armed with the knowledge that aiding and abetting a manipulative or deceptive practice is insufficient under Central Bank [of Denver, 511 U.S. at 191], for example, a plaintiff could deliberately plead facts that established no more than that a particular defendant aided and abetted another's securities fraud. Such incentive is particularly strong where, as here, a plaintiff might rely on the securities fraud of those with few assets to obtain treble damages against deeper pockets.

Id.

In Thomas H. Lee, then-district judge Gerard E. Lynch reached the same conclusion. Thomas H. Lee, 612 F. Supp. 2d at 281-83. As in Fezzani, the plaintiffs in Thomas H. Lee alleged that a defendant violated RICO by aiding and abetting another's securities law violations. Id. at 281. Judge Lynch adopted the reasoning of Fezzani, stating that the plaintiffs' proffered interpretation of the PSLRA's RICO Amendment -- under which "so long as [plaintiffs] are pursuing aiders and abettors[, ]they may proceed under RICO" because their securities claims are not actionable -- is "treacherous." Id. The court explained that "[t]he language of the statute simply does not require that, for a RICO claim to be barred, the plaintiff who sues under RICO must be able to sue under securities laws, or that the conduct 'actionable as securities fraud' on which the plaintiff relies to establish the RICO violation must be that of the defendant." Id. at 281-82; see also id. at 282 ("The [plaintiffs'] argument to the contrary is problematic for precisely the reasons discussed in Fezzani." (citing Fezzani, 2005 WL 500377, at *4, 2005 U.S. Dist. LEXIS 3266, at *14-*15)). Finally, the Thomas H. Lee court

noted that the plaintiffs' narrower interpretation of the RICO Amendment would require the court to "overlook[] that the amendment barring RICO claims was made in the same statute that explicitly . . . authoriz[ed] only the SEC -- not private parties -- to bring enforcement actions against aiders and abettors."  Id.  The court concluded that

> [i]t would be strange indeed if Congress, in a statute that otherwise bars private causes of action under RICO for predicate acts that describe conduct actionable as securities fraud, nevertheless chose to allow enhanced RICO remedies -- treble damages and attorneys' fees -- against only the very parties that Congress simultaneously made immune from private suit under the securities laws.  The better interpretation -- and the one supported by the plain meaning of § 107 [of the PSLRA] -- is that the RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws.

Id. at 282-83 (emphasis in original).

At least one other district court has accepted the interpretation adopted in Thomas H. Lee and Fezzani: Cohain v. Klimley, Nos. 08 Civ. 5047, 09 Civ. 4527, 09 Civ. 10584, 2010 WL 3701362, at *8-*9, 2010 U.S. Dist. LEXIS 98870, at *27-*28 (S.D.N.Y. Sept. 20, 2010) (Paul G. Gardephe, Judge) (adopting the Thomas H. Lee court's interpretation of section 107 of the PSLRA and noting that "most courts to address the subject have held that 'any conduct that would have been actionable as fraud in the purchase or sale of securities' -- including aiding and abetting securities fraud -- may not be relied upon to establish a RICO

18

violation"); see id. at *8, 2010 U.S. Dist. LEXIS 98870, at *27 (collecting cases).

As the Thomas H. Lee court noted, 612 F. Supp. 2d at 281 -- and as the plaintiff points out in its opening brief on appeal and in its supplemental briefing[10] -- at least two other district courts in this Circuit have interpreted the RICO Amendment bar more narrowly. See Seippel v. Sidley, Austin, Brown & Wood, LLP, 399 F. Supp. 2d 283, 292 n.47 (S.D.N.Y. 2005) (Shira A. Scheindlin, Judge) (noting the split among courts in the Southern District of New York on the issue of the breadth of the RICO Amendment's bar). In OSRecovery, Inc. v. One Groupe Int'l Inc., 354 F. Supp. 2d 357 (S.D.N.Y. 2005), the plaintiffs asserted a RICO claim based on the defendant's alleged aiding and abetting of another's securities law violations. The defendant foreign bank moved to dismiss the RICO claim, arguing that it was precluded by the RICO Amendment. Id. at 364, 368. The district court (Lewis A. Kaplan, Judge) denied the defendant's motion, interpreting the RICO Amendment to bar only RICO claims based on predicate acts of securities fraud that the plaintiffs could have pursued as securities claims against the named defendant. See id. at 369-70. That is, the court in OSRecovery thought the relevant question under the PSLRA to be whether "the [specific

---

[10] After oral argument, but before the publication of MLSMK I, we issued an order directing the parties to submit supplemental briefing limited to the issue of PSLRA preclusion of the plaintiff's RICO claim. See Order, MLSMK Inv. Co. v. JP Morgan Chase & Co., No. 10-3040-cv (2d Cir. May 31, 2011), ECF No. 63.

defendant's] alleged conduct is actionable under [the securities] laws." Id. at 369. The district court concluded that, because "there is no private right of action for aiding and abetting under Section 10(b) of the [Securities] Exchange Act," id., and the plaintiffs therefore could not have sought to vindicate their rights by filing a securities claim, the RICO Amendment did not bar the plaintiffs' RICO claim.

In Renner v. Chase Manhattan Bank, No. 98 Civ. 926, 1999 WL 47239, 1999 U.S. Dist. LEXIS 978 (S.D.N.Y. Feb. 3, 1999) (Charles S. Haight, Jr., Judge), the district court determined that the RICO Amendment did not preclude the plaintiff's RICO claim. Id. at *6-*7, 1999 U.S. Dist. LEXIS 978, at *20. Judge Haight reasoned that, because the plaintiff's claim against Chase Manhattan Bank (a predecessor to the defendants in the case now before us) alleged only that the bank aided and abetted the fraud of another, the allegations did not provide a "valid basis for a securities fraud claim." Id. at *6, 1999 U.S. Dist. LEXIS 978, at *18. The court continued that the claim therefore "would not have been 'actionable' against Chase under the securities law," and accordingly was not prohibited by the PSLRA's RICO Amendment. Id. at *7, 1999 U.S. Dist. LEXIS 978, at *20; see also id. at *6, 1999 U.S. Dist. LEXIS 978, at *17-*18 ("[T]he application of the Reform Act turns upon whether Chase's alleged conduct is 'actionable' under the securities laws.").

MLSMK asserts that the district judges accepting the defense of RICO Amendment preclusion were "concerned

20

predominantly with the policy implications of a plaintiff electing between causes of action to evade the restrictions of the PSLRA," Appellant's Reply Br. 21, issues that the plaintiff contends are not present here, see id. ("The court [in Fezzani] specifically feared that a plaintiff who might legitimately have a securities fraud claim against a defendant would nevertheless instead plead only aiding and abetting conduct in order to bring the case under RICO."). The defendants, by contrast, urge us to accept the view adopted in the Fezzani line of cases, citing the court's statement in Thomas H. Lee that the "minority" approach endorsed in OSRecovery "is both unpersuasive and against the great weight of precedent." Thomas H. Lee, 612 F. Supp. 2d at 281; see Cohain, 2010 WL 3701362, at *8, 2010 U.S. Dist. LEXIS 98870, at *27 ("OSRecovery has not been relied on for [the] proposition [that the RICO Amendment 'does not bar RICO claims premised on conduct that constitutes aiding and abetting securities fraud'], however, and several courts have explicitly rejected its reasoning.").

We agree with the defendants that the reasoning of the district courts in Fezzani and Thomas H. Lee is persuasive. We conclude that section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant.[11]

---

[11] MLSMK argues for the first time in its supplemental brief that the defendants' conduct is not "actionable securities fraud" because the "the predicate acts alleged in this case could

21

Crucially, the plain language of the statute "does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording . . . does not make such a connection." In re Enron, 284 F. Supp. 2d at 620; see 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale

not possibly have induced MLSMK to purchase or sell securities." It contends that the claim therefore does not satisfy the requirements of section 10(b) of the Securities Exchange Act. Compare Appellant's Supp. Br. 6, with Appellees' Supp. Br. 7-8. Even were we not to consider this argument waived because of the lateness of the hour in which it was asserted, we would nonetheless decline to address it because we conclude that the effect of the RICO Amendment does not turn on whether MLSMK would be able to state a valid claim against JPMC and Chase Bank under section 10(b).

To the extent that MLSMK argues that the defendants' alleged conduct does not qualify as securities fraud because it was not "integrally related to the purchase and sale of securities," Appellant's Supp. Br. 6, we conclude that the contention is without merit. In Bald Eagle Area School District, the Third Circuit considered a plaintiff's allegation that a defendant bank had assisted in "a massive Ponzi scheme . . . perpetrated through the purchase and sale of [securities] in violation of securities laws including § 10(b) of the Securities Exchange Act of 1934," and determined that the alleged scheme was "at the heart of th[e plaintiff's] RICO action." Id., 189 F.3d at 328. The court concluded that "[a] Ponzi scheme . . . continues only so long as new investors can be lured into it so that the early investors can be paid a return on their 'investment.' Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities." Id. at 330; cf. Sell v. Zions First Nat'l Bank, No. CV-05-0684, 2006 WL 322469, at *10, 2006 U.S. Dist. LEXIS 6558, at *33-*34 (D. Ariz. Feb. 9, 2006) (stating that "the question is not whether a plaintiff can state a claim under a non-securities-related predicate act, but whether the allegations that form the basis of that predicate act occur 'in connection with' securities fraud," and concluding that, in a Ponzi scheme, a bank's "disbursement[s] of money from more recent investors to older investors" are actions "in connection with" securities fraud).

of securities to establish a violation of section 1962." (emphases added)). As another district court has explained,

> when Congress stated that "no person" could bring a civil RICO action alleging conduct that would have been actionable as securities fraud, it meant just that. It did not mean "no person except one who has no other actionable securities fraud claim." It did not specify that the conduct had to be actionable as securities fraud by a particular person to serve as a bar to a RICO claim by that same person.

Hemispherx Biopharma, Inc. v. Asensio, No. Civ. A. 98-5204, 1999 WL 144109, at *4, 1999 U.S. Dist. LEXIS 2849, at *13-*14 (E.D. Pa. Mar. 15, 1999), quoted in In re Enron Corp., 284 F. Supp. 2d at 620. We agree that the RICO Amendment is worded broadly and does not indicate that Congress intended that it be applied in the limited manner that MLSMK urges. Cf. Cent. Bank of Denver, 511 U.S. at 177 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734 (1975) ("When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly.")).

This language seems to us to be unambiguous. But it is worth noting in any event that our reading of it also is supported by the PSLRA's legislative history. Cf. Allard K. Lowenstein Int'l Hum. Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010) ("Any potential ambiguity in the statute's plain meaning is removed, moreover, by the history of the statute's amendments."); id. ("Where we find ambiguity we may delve into other sources, including the legislative history, to

23

discern Congress's meaning." (brackets and internal quotation marks omitted)).

The Conference Committee Report for section 107 states that Congress "intend[ed]" that the section would "eliminate securities fraud as a predicate offense in a civil RICO action," and would bar a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."  H.R. Rep. 104-369, at 47 (1995)(Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 746.  The committee explained that the RICO Amendment's purpose was to "remove [as a predicate act of racketeering] any conduct that would have been actionable as fraud in the purchase or sale of securities as racketeering activity under civil RICO."  Id. (emphasis added); accord S. Rep. 104-98, at 19, 1995 U.S.C.C.A.N. at 698 (repeating the same explanation for the amendment). Congress did not say that it was removing "any claim that would have been actionable."  Its focus was on the behavior alleged to satisfy RICO's predicate-act requirement.

Moreover, it is clear from the Senate Report that Congress was aware that the RICO Amendment would place some claims -- such as those for aiding and abetting securities laws violations -- outside the reach of private civil RICO suits.  But the Senate appears to have been satisfied that the securities laws "generally provide adequate remedies for those injured by securities fraud."  S. Rep. 104-98, at 19, 1995 U.S.C.C.A.N. at

24

698; see id. ("The Committee considered testimony endorsing the result in Central Bank and testimony seeking to overturn th[at] decision. The Committee believes that amending the 1934 [Securities Exchange] Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to [the RICO Amendment's] goal of reducing meritless securities litigation. The Committee does, however, grant the SEC express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws." (emphasis added)).

We are not persuaded by the plaintiff's attempts to distinguish the decisions in Thomas H. Lee and Fezzani. It is true that, in those cases, the plaintiffs pled fraud and RICO claims in the alternative, whereas in this case, the plaintiff pleads only a civil RICO claim without asserting that the defendants are liable for frauds or securities violations of their own. But the district courts' determinations in Thomas H. Lee and Fezzani were not limited to concerns about "gamesmanship" in pleadings. Appellant's Reply Br. 22. Rather, they focused on whether the complaints "relie[d] extensively on [allegations of] fraud to establish . . . liability under RICO," and, where the complaints did so rely, concluded that the RICO claims "fall[] squarely within the scope of the PSLRA bar." Thomas H. Lee, 612 F. Supp. 2d at 281 (internal quotation marks omitted). They analyzed the meaning of the statutory language independently from the specific facts of the cases before them. See generally id.

25

at 281-83; Fezzani, 2005 WL 500377, at *4-*6, 2005 U.S. Dist. LEXIS 3266, at *10-*18.

Nor do we think that the cases relied upon by the plaintiff compel a different conclusion. In OSRecovery, on which MLSMK places great weight, the district court appears to have assumed that the dispositive issue was whether the relevant defendant's conduct was "actionable under the securities laws." Id., 354 F. Supp. 2d at 369. It did not seem to consider the interpretation of the statute pressed by the defendants here or accepted by the courts in Fezzani and Thomas H. Lee -- that it was Congress's intention that the applicability of the RICO amendment to a plaintiff's civil RICO claim would not depend on the plaintiff's ability to bring a private securities law action against a particular defendant.[12]

Finally, the interpretation we adopt today finds support in the decisions of several of our sister circuits. See Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P., 625 F.3d 185, 189-91, 191 n.5 (5th Cir. 2010) (affirming the district court's dismissal of a RICO claim as barred by the PSLRA in spite of the fact that, by doing so, the plaintiff was left without an avenue for relief because it could not assert a section 10(b) securities claim against the relevant defendant); Bixler v. Foster, 596 F.3d 751, 759-60 (10th Cir. 2010) (applying the RICO Amendment to mail and wire fraud, which "cannot support a civil RICO claim after

---

[12] The OSRecovery court did not, of course, have the benefit of the analysis in Fezzani, which was decided two months later.

26

enactment of the PSLRA" if the frauds are "undertaken in connection with the purchase of a security" (internal quotation marks omitted)); Howard v. Am. Online Inc., 208 F.3d 741, 749 (9th Cir.) (holding that the RICO Amendment bar applies even where the plaintiff does not have standing to sue under securities laws because the plaintiff did not buy or sell securities), cert. denied, 531 U.S. 828 (2000); Bald Eagle Area Sch. Dist., 189 F.3d at 330 (Third Circuit decision expressing reasoning similar to that in Fezzani and Thomas H. Lee and concluding that the PSLRA precludes a RICO claim based on a Ponzi scheme that was accomplished by the purchase and sale of securities). While none of these cases addresses the precise question presented here, they do deal with other circumstances in which -- for various reasons -- the plaintiff could not make out a private securities claim against the defendant. Despite the fact that this result left the plaintiffs in those cases, like the plaintiff here, without recourse to a private cause of action under the securities laws, our sister courts nonetheless concluded that the plaintiffs' RICO claims were barred by the RICO Amendment.

## CONCLUSION

For the foregoing reasons, we conclude that the PSLRA's RICO Amendment, 18 U.S.C. § 1964(c), bars a plaintiff from asserting a civil RICO claim premised upon predicate acts of securities fraud, including mail or wire fraud, even where the plaintiff could not bring a private securities law claim against

27

the same defendant.  We therefore affirm the judgment of the district court dismissing MLSMK's RICO claim (Count One) against the defendants JPMC and Chase Bank on that ground.